UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL P. WICKMAN and
TERRY L. WICKMAN,

                Plaintiffs,

v.

                                      Case No: 07-C-352

STATE FARM FIRE & CASUALTY
COMPANY,

                Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

        Plaintiffs Michael and Terry Wickman, a married couple, brought this diversity suit against Defendant State Farm Fire & Casualty Company ("State Farm"), alleging that State Farm breached an insurance contract in failing to pay the Wickmans the full amount due under their homeowners policy for a loss caused by a fire, and that it did so in bad faith. Federal jurisdiction exists under 28 U.S.C. § 1332, and the case is presently before the Court on State Farm's motion for summary judgment. For the reasons set forth below, State Farm's motion will be granted.

## BACKGROUND

**I. The House**

        The case arises out of a fire that severely damaged the Wickmans' home in the Village of Allouez, Wisconsin, on May 17, 2005. The home was originally built in 1985, and both Michael and Terry Wickman were involved in its planning, design and construction. In 2004, the Wickmans hired Kassner Construction ("Kassner") to build an addition to their home. (PPFOF ¶¶ 16-17.) The

project called for Kassner to add several new rooms on the back of the home and to perform limited additional work on part of the original structure. (*Id*. at ¶ 16.) The addition was intended to add approximately 1,000 square feet to what was already a 6,000 square foot house. (*Id*. at ¶ 18.) As with the original construction, the Wickmans were involved with the planning and design of the addition to their home. (*Id*. at ¶ 19.)

## II. The Policy

The Wickmans purchased an insurance policy from State Farm covering the home. Coverage A of the policy covered the house up to $825,000, which increased to $840,675 by the time of the fire due to an inflation clause in the policy. The Wickmans also purchased "Option ID" coverage which increased State Farm's liability by 20% of Coverage A if the amount actually spent by the Wickmans to repair or replace their home exceeded the limit of liability shown in the declarations for the dwelling. (Greene Decl. Ex. B, Doc. # 29-4; Am. Compl. ¶ 9.) State Farm's total potential liability for the house, adjusted for inflation, is $1,008,810. (Am. Compl. ¶ 9.)

The Wickmans' policy contained a "similar construction" provision:

We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **SECTION I - COVERAGES, COVERAGE A - DWELLING**, except for wood fences, subject to the following:
. . . .

(2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less;

2

(Doc. # 29-4 at 20.) "Similar construction" coverage is more favorable to the insured than "common construction" coverage.[1]

In addition to the repair or replacement cost provision, the contract contained an actual cash value provision:

> until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property;

(*Id*.) Because the Wickmans had from the beginning intended to repair or replace their home, however, they never submitted a claim for the actual cash value of the damaged portion. The policy was also subject to various conditions, including that the Wickmans perform certain duties in the event of a loss. Among these duties, the Wickmans were to submit to State Farm a "signed, sworn proof of loss . . ." within 60 days of the loss. (Greene Decl. Ex. B, Doc. # 29-4.)

## III. The Fire

On May 17, 2005, there was a fire at the Wickmans' home. (PPFOF ¶ 25, Doc. # 39.) The fire appeared to have started in the new addition. (*Id*.) The parties dispute how to characterize the extent of the damage to the house. They literally present different pictures of the damage, with State Farm producing photos taken after the fire showing the exterior of the house intact though charred in one area, and the Wickmans producing photos of a charred and gutted interior of part of the house. (Def.'s Summ. J. Br. at 26, Doc. # 33; Pls.' Br. in Opp. to Mot. for Summ. J. at 26, Doc. #

---

[1] The "common construction" replacement cost loss settlement provision State Farm offers indicates that State Farm would "pay the cost to repair or replace with common construction . . ." (Doc. # 29-4 at 20.)

3

37.) As might be expected, the pictures focus primarily on those areas of the home that were damaged. By the time the fire occurred on May 17, 2005, Kassner had billed the Wickmans approximately $655,000 for the building of the addition. (PPFOF ¶ 23, Doc. # 39.)

The day after the fire, May 18, 2005, Randy Greene, a State Farm adjuster, and Steven Davis, his supervisor at the time, appeared at the scene. (*Id*. at ¶ 26.) The next day Davis notified his supervisor by e-mail of the fact there was a "large fire" at an "$840,000 house which may be a total." (*Id*. at ¶ 27.) Davis noted that the building inspector may declare it to be a total loss. (*Id*.) Davis' supervisor then forwarded the e-mail to another State Farm employee and noted "If it is a total, then we pay limits. We are hoping Larry's group can convince the authorities that it is not a total." (*Id*.)

The Village of Allouez' building inspector, Ralph Witte, also appeared at the scene of the fire on May 18, 2005. (*Id*. at ¶ 31.) Davis discussed with Witte whether he would issue a permit to repair the burned house. (*Id*.) On May 24, 2005, Witte wrote Kassner and reported the results of his inspection. Witte found that "approximately 35% of the building has been structurally damaged and as such does not rise to the level of the 50% damage our ordinance requires for demolition rather than repair." (Nicks S. Decl. Ex. L.) The village did not actually have such an ordinance at the time and Witte intended to refer to the state statute governing a municipalities authority to issue raze orders, Wis. Stat. § 66.0413. (PPFOF ¶ 52-53, Doc. # 39.) The village never issued a raze order for the house. (DPFOF ¶ 39, Doc. # 32.)


**IV. Interaction Between State Farm and the Wickmans**

On the day after the fire State Farm began to prepare estimates of what it would cost to repair the Wickmans' home. On May 19, 2005, Davis offered the Premiere Service Program to the

4

Wickmans and suggested Sullivan's Cleaning & Restoration ("Sullivan's") as one of three potential contractors under the program. (PPFOF ¶ 38, Doc. # 39.) Although the Wickmans retained Sullivan's to perform some work relating to the personal property loss, they did not hire Sullivan's to restore or repair their home. (DPFOF ¶ 32.) As they explained to Davis, they cherished their relationship with Kassner as their builder. (PPFOF ¶¶ 39, 40.)

On June 24, 2005, Mr. Wickman asked Davis for an advance against Coverage A. (DPFOF ¶ 47.) State Farm partially completed an estimate of repair on July 1, 2005 and issued an advance payment to the Wickmans of $450,000 under Coverage A. (*Id*. at ¶¶ 48-50.) The previous adjuster, Lori Buntrock, went on medical leave on July 4, 2005, and the next day Greene took responsibility for handling the claim and reviewed the estimate. (*Id*. at ¶¶ 46, 52.) State Farm later revised its estimate of repair and contacted Mr. Wickman. Greene prepared an estimate using the Xactimate computer program on August 26, 2005. (PPFOF ¶ 110.) This estimate was based on price list WIAP5F5B1, effective May 21, 2005, even though the most current price list, WIAP5F5C1, had been released on August 19, 2005. (*Id*. at ¶¶ 108-110.) The updated price list contained 6,520 price changes, and Greene did not tell Wickman that State Farm had updated its list. (*Id*. at ¶ 113.)

Greene wrote Mr. Wickman on August 31, 2005 and indicated that the Wickmans were being provided another $236,264.01 under Coverage A in addition to the $450,000 that had already been advanced. (DPFOF ¶ 86.) Greene's letter stated that the agreed upon replacement cost value of building repairs to the house was $686,264.01 and he instructed the Wickmans, "If you cannot complete the repairs for the agreed estimated amount, please notify me immediately. I can be reached at 920-730-6847. State Farm authorizes no amounts above the enclosed estimate without prior authorization." (*Id*. at ¶ 87.)

5

Mr. Wickman left a voice message for Greene on September 23, 2005, indicating that he thought the estimate was too low given cost increases, including those attributable to Hurricane Katrina. (M. Wickman Decl. ¶ 35, Doc. # 40; Greene Decl. ¶ 31, Doc. # 29.) On September 27, 2005, Greene spoke with Mr. Wickman and told him that all additional costs would need to be documented and justified by the Wickmans and that they would be subject to review by Greene. (Greene Decl. ¶ 32.) On October 3, 2005, State Farm told the Wickmans that it had completed its investigations and that the home was available to them to begin repairs. (PPFOF ¶ 125.) Sometime in October 2005, Mr. Wickman directed Kassner to demolish the house. (DPFOF ¶ 97, Doc. # 32.) As the house was being demolished, additional fire damage to the rafters in the garage which had not been observed previously appeared. (PPFOF ¶ 127.) State Farm estimated these additional damages at $10,000 to $20,000. (Id. at ¶ 131.) The Wickmans never informed State Farm that they were demolishing the house or building a new house. (DPFOF ¶ 99.) State Farm first learned of the demolition of the house when the Wickmans' State Farm agent noticed on November 17, 2005 that the house had been demolished. (Id. at ¶ 100).

Greene had multiple contacts with the Wickmans between November 28, 2005 and April 25, 2006 regarding settlement of their personal property claim, though there were no discussions regarding a claim under Coverage A. (Id. at ¶ 102.) It was not until April 25, 2006, nearly a year after the fire, that Mr.Wickman left a voice message with Greene claiming additional damage had been found to the house months earlier. (Id. at ¶ 104.) Greene called Mr. Wickman on April 26, 2006, and Mr. Wickman said that damage unaccounted for in State Farm's estimate had been discovered to the trusses of the house six months earlier during its demolition. (Id. at ¶ 105.) It was during this conversation that Mr. Wickman told Greene for the first time that he thought Witte's

6

decision not to raze the house was wrong and that he believed State Farm should pay for the demolition and construction of the new house. (*Id*. at ¶ 108.) Greene told Mr. Wickman that before State Farm could consider any additional costs, the Wickmans would need to provide photographs and contractor estimates establishing the additional cost. (*Id*. at ¶ 110.) Mr. Wickman also told Greene he was attempting to get a new ruling from Witte on the now demolished house. (*Id*. at ¶ 111.)

There was no further communication between the Wickmans and Greene until sometime prior to July 3, 2006. At some point prior to this date Mr. Wickman left a voice message with Greene stating he estimated the cost of his new house at $1,280,000 and that he believed they were entitled to the Coverage A policy limits. (*Id*. at ¶ 113.) On July 6, 2006, Mr. Wickman told Greene that the house was assessed at $630,000 prior to the $655,000 addition. (*Id*. at ¶ 114.) Mr. Wickman said he believed State Farm should pay the sum of these two figures. (*Id*. at ¶ 115.) Greene told Mr. Wickman that State Farm did not owe him the cost to build a new structure, but only for any documented increases in material and labor or damage to the house not captured in State Farm's estimate. (*Id*. at ¶¶ 117-18.) He also told Mr. Wickman the burden was on the Wickmans to provide sufficient documentation proving any additional costs and damages claimed. (*Id*. at ¶ 119.) Greene followed up this conversation with a letter to the Wickmans to this effect on July 7, 2006. (Id.)

For Greene, it was again all quiet on the Wickman front until autumn, when on October 17, 2006, Mr. Wickman wrote Greene stating he was meeting with his contractor and would prepare repair cost values. (Doc. # 51 at 48.) Mr. Wickman sent Greene a letter dated November 8, 2006, in which he claims his bills from Kassner totaled $1,217,449.69, which exceeded the contractor's

7

original estimate of $868,977. (DPFOF ¶ 129; M. Wickman Decl. Ex. F.) Mr. Wickman claimed State Farm owed him all but $229,893.32 of the $1,217,449.69. (DPFOF ¶ 130.) Greene spoke with Mr. Wickman on November 28, 2006, and asked him if he had an itemized estimate from Kassner for the costs the Wickmans were claiming; Mr. Wickman said he did not. (*Id*. at ¶ 135.)

Greene wrote the Wickmans a letter on December 16, 2006. (*Id*. at ¶ 137.) The letter stated:

Based on this policy language we are willing to consider an additional payment under Coverage A–Dwelling based on what it would have cost to repair the damage in the original home, up to the coverage limit of liability. Your November 8 2006 letter states the East Wing (garage and finished area above) would require extensive reconstruction which was not included in our estimate. State Farm has paid you $56,708.47 for the repair of the garage and finished area above the garage. Included in that amount were the replacement of roofing, trusses, flooring, siding, drywall and plaster, doors and windows. Please refer to the 8/31/05 estimate for specifics.

. . . .

State Farm will consider any other costs not included in our estimate and not listed above as long as they can be shown to be directly related to and necessary for the repair of the original house. These additional costs for repairing the original structure will need to be verified and documented.

(*Id*. at ¶¶ 141-42.)

After more communication between the parties and State Farm's running another Xactimate estimate using price list WIAP2F6B1, State Farm determined the Wickmans were entitled to $742,059.79 under the policy. (PPFOF ¶ 159.) The Wickmans were paid an additional $55,795.78 on March 21, 2007, bringing the total they had received from State Farm under Coverage A to $742,059.79. (DPFOF ¶¶ 166-67.) State Farm's final Xactimate estimate upon which it based its last payment to the Wickmans provided for a sealing of 3,927 square feet of floor or ceiling joists, 15,922.44 square feet of stud wall and 2,398.38 square feet of the truss system with white

8

pigmented shellac. (PPFOF ¶ 190, Doc. # 39.) The Wickmans filed a complaint in federal court on April 17, 2007. (Compl.)

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id*. at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chi.*, 119 F.3d 1286, 1291 (7th Cir. 1997).

A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact

9

to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Summary judgment is therefore appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id*. at 322.

## II. The Wisconsin Valued Policy Law

The first question is whether summary judgment should be granted in favor of State Farm on the Wickmans' claim that they are entitled to the face value of the policy under Wisconsin's "valued policy law," which provides:

> **(2) Total loss.** Whenever any policy insures real property that is owned and occupied by the insured primarily as a dwelling and the property is wholly destroyed, without criminal fault on the part of the insured or the insured's assigns, the amount of the loss shall be taken conclusively to be the policy limits of the policy insuring the property.

Wis. Stat. § 632.05(2). Under its plain terms, the statute relieves an insured homeowner of any duty to prove the actual amount of the loss or damage to his or her home and requires the insurer to pay the policy limits whenever the home is "wholly destroyed." *Cambier v. Integrity Mut. Ins. Co.*, 2007 WI App 200, ¶ 7, 305 Wis. 2d 337, ¶ 7, 738 N.W.2d 181, ¶ 7, *review denied*, 2007 WI 134, 305 Wis. 2d 130, 742 N.W.2d 528 (Table).

Enacted in 1874, Wisconsin's valued policy law has several purposes. It was intended to discourage property owners from over-insuring their property at a time when the frequency of arson

10

was increasing, while simultaneously thwarting insurers from collecting excessive premiums. *Seider v. O'Connell*, 2000 WI 76 ¶ 54, 236 Wis. 2d 211, 612 N.W.2d 659. The legislature believed the law "would diminish fraud and prompt insurance companies to issue more realistic appraisals." *Id.* The law was also intended "to eliminate controversy about the amount of loss in the event of property destruction." *Id.* The valued policy law applies even when the insurance contract itself has terms to the contrary. *Cambier*, at ¶ 7. If the statute applies to the Wickmans' loss here, they would be entitled to the full $1,008,810 available under Coverage A.

State Farm contends that the statute is inapplicable in this case as the Wickmans' house was not "wholly destroyed" within the meaning of the statute. The Wickmans assert that this question is one for the jury. They also argue that although Witte did not order the house to be razed, he should have, and that therefore the house should also be considered a constructive total loss.

The statute itself does not define the extent of loss necessary to result in a structure being "wholly destroyed." There has been little comment from the Wisconsin courts on this issue. The Wisconsin Supreme Court commented on the predecessor to the current valued policy statute in *Fischer v. Harmony Town Ins. Co.*, 249 Wis. 438, 24 N.W.2d 887 (Wis. 1946). In *Fischer*, the insured's barn suffered fire damage. "Practically all of the wooden superstructure" of the barn was destroyed or burned and charred, though parts of the ground floor and farm equipment on the ground floor escaped damage. 249 Wis. at 440. The insured argued that the valued policy law should apply, and the trial court gave the following instruction to the jury on the statute:

> Total loss under the statute does not mean that the material of which the building is composed shall be annihilated or reduced to a shapeless mass; total loss is when the identity of the structure as a building is destroyed so that its specific character as such no longer remains, and *there is nothing left but the cellar or basement or walls or a dilapidated foundation * * * although the basement walls are still standing*, and

11

even though the defendant claims that they were in the same or as good condition after the fire (although there is evidence to dispute this fact) *and have retained their distinct character as part of the building, yet this of itself will not prevent the loss from being regarded as one of total loss*.

*Id.* at 442 (emphasis and ellipses in original). The Wisconsin Supreme Court held that the trial court was not in error for giving this instruction regarding what constitutes "total loss" under the statute.

I conclude that given the instruction approved by the Wisconsin Supreme Court in *Fischer*, no reasonable fact finder could conclude that the Wickmans' house was "wholly destroyed" for purposes of Wis. Stat. § 632.05(2). Photographs taken of the exterior of house after the fire demonstrate that the structure remained standing. (Doc. # 28-4 at 1-5.) Although a portion of the exterior of the house was charred, much of the exterior appears to have been unaffected by the fire. Viewing these photographs, one cannot reasonably maintain that "identity of the structure as a building is destroyed so that its specific character as such no longer remains," as the structure was still recognizable as a house. *Fischer*, 249 Wis. at 442. Further, Witte, the village's building inspector, found that approximately 35% of the building had been structurally damaged. (Nicks S. Decl. Ex. L, Doc. #43-11.) No matter how the parties characterize the extent of the loss to the house, the photographs taken of the house are inconsistent with the Wickmans' claim the house was wholly destroyed.[2]

Even if the damage to the house was not of such a magnitude as to make it a total loss under the statute, however, the house would be considered a constructive total loss, and the Wickmans

---

[2]State Farm avers that "[t]he fire was confined to the kitchen area of the new addition, the basement below the kitchen and portions of the second floor above the kitchen." (Doc. # 51 at 13.) The Wickmans dispute this proposed finding of fact and claim that "fire caused substantial damages to every room in the home." (*Id.*) The Wickmans respond similarly to State Farm's claim that "[t]he majority of the House had not burned but did suffer smoke damage." (*Id.*)

12

could still avail themselves of the protection of § 632.05(2), if the house had been ordered destroyed by a competent government body. *Gimbels Midwest, Inc. v. Nw. Nat'l Ins. Co. of Milwaukee*, 72 Wis. 2d 84, 91, 240 N.W.2d 140, 145 (Wis. 1976) (recognizing that when an owner who is precluded from rebuilding and is required by a municipality to destroy the building, a constructive total loss results and the valued policy law applies to require the insurer to pay the full face value of the policy); Wis. Admin. Code § INS 4.01(2)(h) ("Operation of building laws. Real property owned and occupied by the insured which is partially destroyed but ordered destroyed under a fire ordinance or similar law shall be considered wholly destroyed for purposes of s. 632.05 (2), Stats.").

Although the Wickmans were never ordered to raze their house, they now contend that the property was a constructive total loss as they claim Allouez Building Inspector Witte should have ordered it razed. They note that the authority to issue raze orders is codified in Wis. Stat. § 66.0413, which provides that "if a municipal governing body, building inspector, or designated officer determines that the cost of repairs of a building . . . would exceed 50% of the assessed value of the building, divided by the ratio of the assessed value to the recommended value as the last published by the department of revenue for the municipality within which the building is located, the repairs are presumed unreasonable . . . ", the municipality may order the building razed. Wis. Stat. § 66.0413(1)(c). The Wickmans contend that the cost of repairing their home "not only exceeded 50% of the assessed value of the home, but actually exceeded the entire assessed value by several hundred thousand dollars." (Pl.'s Br. In Opp. S.J. at 27-28.) Witte's failure to issue a raze order under these circumstances, they contend, was due to his confusion over the proper criteria, as well as improper influence by State Farm's claims adjuster. (*Id.* at 28-29.) Since the cost of repairs to

13

their home clearly exceeded the minimum amount required to issue a raze order, the Wickmans argue that the home should be considered a constructive total loss.

The question of whether there has been a constructive total loss, however, is determined not by whether a raze order could have been issued, but by whether such an order was in fact issued. As State Farm observes, the statute that authorizes a municipality to order a building razed, is permissive and does not mandate that the village issue a raze order no matter what its condition. Wis. Stat. § 66.0413(1)(b) (". . . The governing body, building inspector or other designated officer of a municipality *may* . . . order the owner of the building to raze the building . . . .") (emphasis added). The village is thus not required under the statute to issue raze orders, even if, as the Wickmans contend, the damage exceeded what was needed to permit such an order. The fact that no such order was issued in this case precludes a finding of a constructive loss.[3]

This means that in order to take advantage of Wisconsin's valued policy law, the Wickmans would have to establish an actual total loss within the meaning of § 632.05(2). Since, for the reasons already stated, they are unable to do so, their claim for the policy limits under the valued policy law fails. I therefore turn to the Wickmans' alternative claim that State Farm breached the insurance contract by failing to pay them the amount needed to repair or replace their damaged home.

_____

[3]State Farm also argues that the Wickmans did not "occupy" the house for purposes of § 632.05(2) at the time of the loss since they were living in rented property while the addition was under construction. As I find that the statute is inapplicable given the fact the house was not a "wholly destroyed," I need not address the question of whether the Wickmans actually occupied the house as contemplated by the statute.

Case 1:07-cv-00352-WCG   Filed 03/24/09   Page 14 of 26   Document 53

### III. Cost To Repair Or Replace With Similar Construction

The Wickmans' insurance contract provided that State Farm would, subject to the policy's limits, pay the cost to repair or replace their home with similar construction in the event of a loss. (Doc. # 29-4 at 20.) At its core, the dispute between the parties on the Wickmans' alternative claim against State Farm is over whether it was necessary to replace the Wickmans' home, as opposed to repair it. The Wickmans contend that are entitled to replacement cost benefits in the amount of $987,611, which exceeds the $742,059.79 State Farm has already paid under the policy by $245,551.21. State Farm, on the other hand, contends that the home should have been repaired, not replaced, and further, that the Wickmans have failed to produce any evidence from which a jury could find that the cost of repair would have exceeded what they have already been paid. State Farm's contention is not without merit.

From the time of the fire on May 17, 2005, through at least when State Farm told the Wickmans they could begin repairing the house on October 5, 2005, the communications between the parties were over the cost of repairing the house. Without notice to State Farm, the Wickmans then had the damaged house demolished and proceeded to build a new house. Mr. Wickman made the decision to tear down the damaged house and rebuild it based upon his conclusion that the house was "a total loss from a financial standpoint because it was clear that the eventual costs of repair would exceed the cost of reconstruction." (M. Wickman Decl. ¶ 26.) The Wickmans never provided State Farm an itemized estimate of the costs of repairing the house for the simple reason that they did not believe it was feasible to repair it. (Pl.'s Resp. to DPFOF ¶ 131.) After the construction of their new house was completed, they provided State Farm with cost tracking information from Kassner for the demolition and new construction (DPFOF ¶ 126) and demanded

State Farm pay the amount shown, less what they conceded were "extras" they had decided to add on to their new home and for which, they admit, State Farm was not responsible. (*Id.* at ¶ 130.) The remaining amount, the Wickmans contend, constitutes the replacement cost, and that is the measure of damages to which they claim they are entitled under the terms of the policy.

State Farm contends, however, that the Wickmans have offered no admissible evidence to support their contention that the home could not have been repaired at a lower cost. The only Rule 26(a)(2) expert report they disclosed was that of the attorney they retained as a bad faith expert. Their building contractor, Steven Kassner, has offered no opinion on whether the house was repairable, the scope of the repairs that would be needed, or their cost. In fact, Kassner admitted that he was not qualified to opine on the cost to repair the damaged house. (Def.'s PFOF ¶ 133.) Absent a qualified expert who is prepared to offer an opinion that replacement was a more feasible option than repair, or that the actual cost of repair would have exceeded what they were already paid under the policy, State Farm contends that the Wickmans cannot meet their burden on an essential element of their claim, namely, that State Farm breached the contract by failing to pay them the full amount to which they were entitled.

The Wickmans in response rely on the "broad evidence" rule, under which the trier of fact is given "considerable leeway and latitude" in property loss cases. *Doegler & Kristen, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.*, 42 Wis. 2d 518, 523-24, 167 N.W. 2d 198, 199-200 (Wis. 1969). In *Doegler*, the Wisconsin Supreme Court adopted the following statement of the rule:

> "Where insured buildings have been destroyed, the trier of fact, may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss. It may consider original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by

16

the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject."

*Id.* (quoting *McAnarney v. Newark Fire Insurance Co.*, 159 N.E. 902, 905 (N.Y. 1928)). Under the "broad evidence" rule, the Wickmans contend, expert testimony is not required to prove damages in property loss cases. They contend that under Wisconsin law the trier of fact is permitted to consider "every fact and circumstance which logically contributes to a correct estimate of the loss." (Pl.'s Br. In Opp. S.J. at 33-34.)

Among the facts the jury may consider in assessing their damages, the Wickmans contend, is the actual cost paid to replace their home. In addition, the Wickmans contend that their own opinions, as owners of the home, are relevant and admissible. (*Id.* at 34 (citing *Trible v. Tower Ins. Co.*, 43 Wis. 2d 172, 187, 168 N.W.2d 148 (1969); and *Farley v. Spring Garden Ins.*, 148 Wis. 622, 627, 134 N.W. 1054 (1912)). Lastly, the Wickmans point to a statement allegedly made by Patrick Sullivan, a principal of Sullivan's Cleaning & Restoration, one of the three contractors State Farm uses under its Premier Service Program. Mr. Wickman asserts that he asked Sullivan, a certified restorer, what he would do if it was his house. According to Mr. Wickman, Sullivan replied that he would simply start over rather than try to repair it. (Aff. of Michael Wickman ¶ 25.) Based on this evidence, the Wickmans contend that a jury could find that State Farm breached the policy by failing to pay them the costs of replacing their home.

There are several problems with the Wickmans' argument. The most serious is that the broad evidence rule applies only to the determination of actual cash value of property when the term "actual cash value" is not otherwise defined by the policy. *Doegler*, 43 Wis. 2d at 522-23; 167 N.W. 2d at 199-200; *see also SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Properties, LLC*, 445

17

F. Supp. 2d 320, 342 (S.D.N.Y. 2006) ("The 'broad evidence rule' . . . was formulated . . . as a default rule when a policy contains no definition whatsoever of the term 'actual cash value.'"). The broad evidence rule does not apply to the determination of the cost needed to repair property. *See Nissenbaum v. Daniels*, No. 2006AP1042, 2007 WL 823934 (Wis. App. March 20, 2007) (unpublished decision) (affirming trial court's dismissal of case on ground that plaintiff lacked qualified expert to testify on cost of structural repairs).

Even where applicable, the rule does not represent the wholesale abandonment of the evidentiary rules governing proper foundation and expert witness qualifications in property loss cases that the Wickmans suggest. While the rule permits consideration of a broad range of facts relating to the property in question, such as the costs of construction, the building's history, its permitted uses, and the surrounding area, it still requires that "opinions upon value [be] given by qualified witnesses." *Doegler*, 43 Wis. 2d at 523; 167 N.W. 2d at 200 (quoting *McAnarney*, 159 N.E. at 905). Were it otherwise, the broad evidence rule would have little application in proceedings in federal court where evidentiary issues are governed by the Federal Rules of Evidence, as interpreted by the federal courts in such cases as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Barron v. Ford Motor Co. of Canada Ltd.*, 965 F.2d 195, 198 (7th Cir.1992) ("Even in diversity cases the rules of evidence applied in federal courts are the federal rules of evidence rather than state rules . . .").

The same considerations apply to the opinions of the Wickmans as owners of the property in question. While Wisconsin courts may permit a non-expert owner to testify as to the value of his real property, *Trible*, 43 Wis. 2d at 187, 168 N.W.2d at 156, the issue here is not the value of the Wickmans' property, but the feasibility and cost of repairing it. These are clearly issues that require

18

technical or other specialized knowledge beyond that of the ordinary layperson. The opinion testimony of lay witnesses is therefore not allowed. Fed. R. Evid. 701. Moreover, while the Wickmans may have learned a great deal from their experience in the design and construction of their home, the addition to it, and its replacement, they clearly lack the education, training or experience that would be needed to offer an expert opinion under Fed. R. Evid. 702 on the question of what it would have cost to repair the home instead of demolishing it and building an entirely new home. Even their experienced contractor, who actually performed the work required for the construction of their home, the addition, and the replacement, acknowledged that he lacked the specialized knowledge needed to offer an opinion on the feasibility and cost of repair, as opposed to replacement. In view of the foregoing, the Wickmans' opinions on these issues clearly fall below the standard enunciated in *Daubert* for the admission of expert testimony.

The last item of evidence offered by the Wickmans on the issue of the feasibility of replacement is the alleged statement of Patrick Sullivan recounted by Mr. Wickman in his affidavit. (Wickman Aff. ¶ 25.) This evidence likewise falls short of what would be needed for the Wickmans to prove their claim. Sullivan's purported statement is insufficient, first and foremost, because it is inadmissible hearsay. An affidavit offered in opposition to a properly supported motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). "[I]nadmissible hearsay cannot be used to overcome a properly supported motion for summary judgment." *Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006) (citing *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir.2003)). Even if it was admissible, the statement attributed to Sullivan is insufficient to defeat summary judgment. Sullivan's statement,

19

as recounted by Mr. Wickman, was simply an expression of what he would do if it was his house. He offered no opinion as to whether repair was feasible or what the cost would be. The fact that Sullivan, had he been in the position of the Wickmans, may have preferred to start over and build an entirely new house does not mean that State Farm was required under the terms of its policy to pay for the cost of building an entirely new home.

The Wickmans devote much of their brief to challenging the basis for State Farm's determination of the cost of repair. They contend that State Farm's assumptions were wrong in its estimate of the cost of repair. First, they point to State Farm's final Xactimate estimate upon which it based its last payment to them. It is undisputed that this estimate provided for sealing some 3,927 square feet of floor or ceiling joists and 2,398.38 square feet of the truss system with white pigmented shellac, and further sealing of 15,922.44 square feet of stud wall with white pigmented shellac for odor control. (PPFOF ¶ 190, Doc. # 39.) They note that the policy called for repair or reconstruction of their house with materials of a "similar construction", and argue that State Farm's estimate, premised upon sealing thousands of square feet of their home, failed to satisfy this provision. The Wickmans also argue that State Farm's Xactimate estimates were "preliminary" only, cannot be verified, were not made by qualified personnel, and may have been manipulated.[4] (Pls.' Br. in Opp. to Def.'s Mot. for Summ. J. at 36-37.)

This line of argument ignores the procedural posture of the case and the fact that the Wickmans, as plaintiffs, bear the burden of proof on the issue of breach. In its motion for summary

---

[4] State Farm also relies upon the opinion of Gerry Maier, a civil engineer with 52 years of experience in property restoration work, who opined that the property could have been repaired for the amount State Farm paid. The Wickmans contend, however, that Maier's opinion is unfounded and indicate that should this matter proceed to trial they intend to challenge the admissibility of his expert testimony. (*Id.* at 39 n.17.)

judgment, State Farm contends that the Wickmans have no admissible evidence that it breached its policy by failing to pay them the full amount required under Coverage A. In response to State Farm's motion, the Wickmans were required to show that they have some evidence from which a jury could find that it breached the terms of the policy. This is a proper use of summary judgment. *See Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Thus, the question before me is not whether State Farm can prove that what it has already paid is sufficient, but whether the Wickmans have evidence to show that it is not.

At a trial, it would be the Wickmans' burden to show that the $742,059.79 State Farm has already paid under Coverage A of the policy, however State Farm arrived at the figure, was insufficient to satisfy its obligation under the insurance contract. The Wickmans claim State Farm's payment was insufficient because repair of the home was not feasible and the costs of demolishing it and building a replacement home exceeded the amount paid. But as the foregoing discussion shows, they have no admissible evidence to offer from which a jury could reach these conclusions and find in their favor. Their personal opinions that the home could not be repaired, or that the necessary repairs would cost more than State Farm has already paid, are not admissible. And they have disclosed no expert who holds such opinions and could so testify at trial. Without such evidence, they cannot prevail.

In focusing on State Farm's proposed repair, the Wickmans challenge the recommendation that any lingering odor of smoke be eliminated by covering affected components of the home with

shellac, but they offer no evidence that this is not an effective and accepted method of repair and restoration. They argue that "[i]t does not take an expert to know that covering smoke damaged and charred stud walls and joists with shellac is [not] the same as replacing them with similar construction." (Pls.' Br. in Opp. to Def.'s Mot. for Summ. J. at 36.) The question, however, is not whether covering some components with shellac is "the same as replacing them with similar construction." State Farm's proposal did not call for replacing these components, but rather repairing them. Thus, under State Farm's proposal the construction of these components would be not only similar to the original, it would be the same. The assumption that underlies the Wickmans' criticism of State Farm's proposal is that covering the affected building components with shellac is not a reasonably effective repair. Unfortunately, they have offered no admissible evidence that it is not.

More important, however, is the fact that State Farm never told the Wickmans that it would not pay more than the $742,059.79 it paid prior to their commencement of this lawsuit. After it paid the first $686,264 on the loss, Greene told the Wickmans that "[i]f you cannot complete the repairs for the agreed estimated amount, please notify me immediately." (DPFOF ¶ 87.) Having elected to rebuild instead of repair, it was no longer possible after October of 2005 for the Wickmans to submit a claim for the actual repair cost, but State Farm remained willing to consider any information they cared to submit in support of their contention that State Farm's estimated repair cost was too low. As late as December 16, 2006, more than a year-and-a-half after the fire, and as long as six months after the new house was completed, Greene advised the Wickmans that "State Farm will consider any other costs not included in our estimate and not listed above as long as they can be shown to be directly related to and necessary for the repair of the original house." (DPFOF

22

¶ 142.) Even later, on March 21, 2007, State Farm paid an additional $55,795 on the claim. Instead of presenting State Farm with evidence that repair of the home was not feasible or that the cost of repair exceeded what State Farm had already paid, the Wickmans simply insisted that State Farm pay the cost of replacing their home with a new home. When it refused, the Wickmans filed suit.

In light of the Wickmans' failure to come forward with their own evidence of what repair of the home would have cost, State Farm's preliminary estimate of the cost of repair is, as the Wickmans concede, largely irrelevant to the issue of whether State Farm breached the insurance contract. (Pl.'s Br. in Opp. to Mot. for Summ. J. at 23.) This is not a case in which the insurer simply denied a clearly covered claim or refused to pay it based on its own "low-ball" estimate. *See, e.g., Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 271 N.W.2d 368; *Fehring v. Republic Ins. Co.*, 118 Wis. 2d 299, 347 N.W.2d 595 (1984), (overruled in part on other grounds, *DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 547 N.W.2d 592 (1996)). State Farm concluded that the home could be repaired, as did the only restoration contractor to inspect the property. State Farm then advanced the Wickmans a substantial sum of money to undertake the needed repairs and indicated it would pay additional amounts upon a showing that more money was needed to complete the job. Instead of trying to convince State Farm that repair of the home was not feasible and would cost substantially more than it estimated, the Wickmans decided to have the entire home, including the basement, demolished (Aff. of Claude J. Covelli, Ex. C., Dep. of Steven Kassner at 31-32) and rebuild a new home. They then presented the bill for their new home, less extras, to State Farm for payment, insisting that they were entitled to replacement cost under the policy. Neither prior to filing their lawsuit, however, nor since, have the Wickmans produced any evidence from which a

23

finder of fact could conclude either that the home could not feasibly be repaired or that the costs of doing so would have exceeded the amount the already received.

To be sure, the Wickmans have presented evidence suggesting that State Farm's repair estimate was prepared by an inexperienced claims adjuster using an out-of-date price list who failed to consider the full extent of the damage. Had the Wickmans presented State Farm with a properly supported claim setting forth reliable evidence either that repair of the home was not feasible, or that the actual cost of repair would have exceeded what State Farm had already paid them, and had State Farm in reliance solely on its own estimate refused to consider any further payment, their criticisms of State Farm's estimate would certainly be relevant to their claim of bad faith. Where an insurer unreasonably denies or delays payment of its insured's properly supported claim it may be found liable for bad faith. *Anderson*, 85 Wis. 2d at 692, 271 N.W.2d at 377. This does not mean, however, that an insurer is required to pay whatever its insured demands. An insurer "is entitled to challenge claims on the basis of debatable law or facts, and liability will be imposed 'only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.'" *Fehring*, 118 Wis. 2d at 310, 347 N.W.2d at 601 (quoting *Anderson*, 85 Wis. 2d at 693, 271 N.W.2d 368).

If State Farm had rejected a properly supported proof of loss by the Wickmans solely on the basis of its own questionable estimate, their claims for breach of contract and bad faith would both proceed. But that is not what happened. State Farm declined further payment not because Wickmans' demand exceeded State Farm's estimate, but because they never offered the documentation needed to support their demand for additional payment. They never presented reliable evidence to show that the home could not have been reasonably repaired or that the cost of

24

doing so would have exceeded what they had been paid already. Instead, the Wickmans simply insisted that State Farm take their word for the fact that repair was not feasible and that they were entitled to the cost of rebuilding. When State Farm did not, the Wickmans filed suit, and even now offer no admissible evidence that repair was not feasible or that the cost of repair would have been greater than the almost $750,000 they were paid.

Given this absence of evidence, the Wickmans' claim for replacement costs under the policy, like the claim for the policy limits under the valued policy law, must fail. Summary judgment will therefore be granted on their breach of contract claim. And having failed to produce sufficient evidence to proceed on their claim that State Farm breached its contract with its insureds by failing to pay them the amount due under the policy, it necessarily follows that their claim for bad faith based on State Farm's refusal to pay additional amounts also fails. A bad faith claim cannot survive dismissal of the breach of contract claim for the simple reason that an insurer that has no duty to pay cannot be in bad faith for failing to do so.

**CONCLUSION**

For the reasons set forth above, I conclude that there is no genuine issue of material fact on the question of whether the Wickmans' home was either actually or constructively "wholly destroyed" for purposes of Wisconsin's valued policy law. I also conclude that the Wickmans have shown no evidence from which a jury could find that State Farm breached the insurance contract by failing to pay them the amount due for repair or replacement costs under the insurance policy. With their claim for breach of contract gone, the Wickmans' claim for bad faith fails also.

25

Accordingly, State Farm's motion for summary judgment is granted. The Clerk is directed to enter final judgment in favor of State Farm dismissing all claims against it.

**SO ORDERED** this ___24th___ day of March, 2009.


_s/ William C. Griesbach_____
William C. Griesbach
United States District Judge